**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

METROPOLITAN LIFE INSURANCE
COMPANY, et al.,

          Plaintiffs,

vs.                             Case No. 3:04-cv-668-J32HTS

TIARESA E. CARTER, et al.,

          Defendants,

_____

## ORDER

      Metropolitan Life Insurance Company ("MetLife") and Metropolitan Insurance
and Annuity Company ("MIAC") have filed this interpleader case against Tiaresa
Carter, Blondell Johnson, and Takita Williams to determine the correct
beneficiaries of monthly annuity payments following the death of the annuitant,
Annie Mae Williams.  (Doc. 47.)  Tiaresa, Blondell, and Takita have filed
counterclaims for breach of contract against MetLife and MIAC.[1]  (Docs. 51, 55.)
Blondell has filed a cross-claim for interference with an expectancy against Takita.
(Docs. 54.)  Willie Williams has intervened as the personal representative of Annie
Mae's estate.  (Doc. 76.)  Now before the Court are dispositive motions filed by

_____

[1]      The Court normally uses parties' surnames out of respect; however, first
names are used in this Order when it otherwise would be too confusing.

MetLife and MIAC (Doc. 96) and Takita (Doc. 91, 93).[2]  A hearing was held on October 13, 2005, the transcript of which is incorporated herein.[3]

I.    **Facts**[4]

A.    The Explosion and Fire

Annie Mae was part of a large extended family from Lake City, Florida.  In 1994, when Annie Mae was 72-years-old, a gas explosion and fire destroyed the house in which she and others were living.  Present were Annie Mae, Gloria Bowman (a woman who Annie Mae had raised as if a daughter), Tina Bryant Fulton and Toderick Bryant (two of Gloria's three children and the sister and brother of Tiaresa), Michael (Tiaresa's minor son), and Robbreonte (Tina's minor son).  These individuals sustained varying degrees of injury, with Gloria suffering injuries that led to her death.

---

[2]    Neither Tiaresa nor Willie have filed either their own dispositive motions or responses to those filed by MetLife, MIAC, and Takita.  Blondell has not filed any dispositive motions, but has responded in opposition to those filed by MetLife, MIAC, and Takita.

[3]    Counsel for MetLife, MIAC, Blondell, Takita, and Willie appeared at the hearing.  Counsel for Tiaresa was invited to attend but did not do so.

[4]    The facts are taken from the numerous documents, affidavits, and deposition transcripts filed in this case.  Most of the facts are undisputed.  Some of the statements in the affidavits and depositions are inadmissible hearsay or arguably so; however, unless otherwise discussed in the analysis, those statements are immaterial to the Court's decision and are included only for background purposes.

Annie Mae spent over a month in the hospital with burns on her chest and lower body.[5]  When she was released, she lived for a brief period with Blondell (a contemporary of Gloria and a friend of both Gloria and Annie Mae),[6] then with Coretha Austin (a friend and neighbor of Annie Mae), until she moved into a trailer placed on the land where the house once stood.  Tina and Toderick, both in their teens or early twenties, thereafter lived sporadically with Annie Mae in the trailer.

From the moment she moved into the trailer, Annie Mae wanted to replace it with a house, but had difficulty moving forward with construction because ownership of the land was shared by other family members.  Annie Mae retained an attorney to help buy their interests or divide the property, but Annie Mae never succeeded in this endeavor.  Willie (a nephew of Annie Mae and the father by different mothers of Tiaresa and Takita) was one of the family members who owned a partial interest in the land.[7]

_____

[5]     Annie Mae's injuries were limited to her chest and lower body; thus, her ability to see, hear, and speak were unaffected.  Even so, Blondell testified that Annie Mae did not have the same capacity to understand after the explosion and fire as she did before.

[6]     Whether and for how long Annie Mae lived with Blondell is disputed. Blondell says Annie Mae lived with her for several months; Takita says Annie Mae lived with Blondell for about a week; other witnesses say that Annie Mae never lived with Blondell or that they could not recall any such arrangement.

[7]     The real property apparently had been owned by Annie Mae's parents, Pete and Effie Williams.  When Pete and Effie died, the real property was not probated, but was deemed to belong in equal portions to their three children, Annie Mae,

-3-

As Annie Mae was in her seventies, took several medications, had difficulty walking, had suffered burns, and had diabetes, arthritis, and high blood pressure, several people helped her with errands, transportation, medication, finances, and day-to-day living, including neighbors, church friends, Meals on Wheels volunteers, Blondell, Willie, Takita, Robin Davis (a home health care aide),[8] Carl and Bee White (a brother-in-law of Annie Mae and his wife), and Bernard and Melva Rose Scippo (life-long friends of Annie Mae).

B.    The Settlement

At some point after Annie Mae was released from the hospital, Blondell called the Florida Bar and obtained the names of attorneys who could help Annie Mae recover damages from the explosion and fire.  After speaking to different attorneys, Annie Mae and Blondell selected James Feiber, an attorney from Gainesville, Florida.  Feiber prepared a "Durable Power of Attorney" that granted Blondell the power to act as Annie Mae's attorney-in-fact.  Feiber also filed a state case against several defendants, including Sawyer Gas of Jacksonville, Inc.

_____

Lucinda White, and Peter Williams.  When Lucinda and Peter died, their portions were deemed to belong to their respective heirs.  Willie was one of Lucinda's two children, and thus has some interest in or claim to a portion of the real property.

[8]    Blondell testified that, through Blondell's efforts, the Council for Senior Services assigned Robin to help Annie Mae.  Robin testified that Robin thereafter assisted Annie Mae both through the Council for Senior Services and on her own time.

-4-

("Sawyer").[9]  The plaintiffs were Annie Mae; Tina as next friend of Robbreonte; and Tiaresa as next friend of Michael, personal representative of Gloria, and guardian of Toderick.

The state case was resolved by an order approving a settlement that included cash payments by some of the defendants and a structured settlement by Sawyer and its insurer, National Union Fire Insurance Company of Pittsburgh, P.A. ("National Union").  The structured settlement is documented in a "Settlement Agreement and Release" ("Release") dated August 7, 1998, and executed by National Union, Annie Mae, Tiaresa, Tina, and Blondell.[10]  In the Release, Sawyer was designated as the "Defendant" and National Union was designated as the "Insurer."  (Doc. 97 Bates 0017.)

Under the Release, Annie Mae was to receive monthly payments of $2,840 for life, with 15 years guaranteed, beginning on August 15, 1998.  As part of the structured settlement, the Release included a provision to allow National Union to make a "qualified assignment" to MIAC of this monthly payment obligation:

---

[9]     The state case was filed in the Circuit Court of the State of Florida, Third Judicial Circuit, in and for Columbia County, and styled Carter v. Sawyer Gas of Jacksonville, Inc., No. 96-155-CA.

[10]     At the time the Release was executed, Blondell had become the guardian of Toderick since his original guardian - - his sister Tiaresa - - was in the military and stationed out-of-state.  Blondell therefore executed the Release on Toderick's behalf.

> The parties hereto acknowledge and agree that the Defendant [Sawyer] and/or the Insurer [National Union] may make "qualified assignments" within the meaning of Section 130(c) of the Internal Revenue Code of 1986 as amended, of the Defendant's [Sawyer's] and/or the Insurer's [National Union's] liability to make the periodic payments required herein.  Such assignments, are accepted hereby irrevocably by the Plaintiffs and shall completely release and discharge the Defendant [Sawyer] and the Insurer [National Union] from such obligations hereunder as are assigned to ... [MIAC] ... .  The Plaintiffs recognize that, in the event of such assignment, the assignees shall be the sole obligors with respect to the obligations assigned ... .

(Doc. 97 Bates 0019-0020.)  A concomitant provision in the Release made the Release binding on all assignees.  The assignment from National Union to MIAC was documented in a "Uniform Qualified Assignment" ("UQA") executed by National Union and MIAC and made effective on the same date as the Release. (Doc. 97 Bates 0004-0006.)   In the UQA, Annie Mae was designated as the "Claimant," National Union was designated as the "Assignor," MIAC was designated as the "Assignee," and MetLife was designated as the "Annuity Issuer." (Doc. 97 Bates 0004.)

The Release further included a provision to allow MIAC to fund its periodic payment obligation through an annuity policy[11] from MetLife:

> The assignees reserve the rights to fund their liability to make periodic payments through the purchase of annuity policies from ... MetLife ... . The Assignees shall be the owners of their annuity policy, and shall

---

[11]     The Florida Insurance Code deems annuity policies to be life insurance polices.  See Fla. Stat. § 624.602(1).

> have all rights of ownership.  The Assignees may have the annuity
> carriers ... [MetLife] ... mail payments directly to the designated
> payees.  The designated payees and/or their legal representatives
> shall be responsible for maintaining the currency of the proper mailing
> address and mortality information to ... [MIAC] ... .

(Doc. 97 Bates 0020-0021.)  The annuity policy is documented in an annuity

certificate issued by MetLife to MIAC.  In the annuity certificate, Annie Mae was

designated as the "Measuring Life" and MIAC was designated as the "Owner."

(Doc. 97 Bates 0001.)

Blondell, who was present when the Release was executed, testified that

Annie Mae understood its terms and that, at the time of its execution, did not have

diminished capacity, was not confused, had the ability to manage her financial

affairs, and "was fine mentally."  (Doc. 94 Ex. 6 p. 50.)  Both Blondell and Robin

also testified, however, that Annie Mae did not have a good understanding of how

much money she had after the settlement.  Attorney Feiber, who also was present

when the Release was executed, added:

> In my opinion, at the time Annie Mae Williams signed the release and
> other documents, she was competent.  On the other hand, due to the
> circumstances of her lack of formal education, lack of financial
> judgment, inexperience in managing large sums of money, her age,
> and physical illness, I believe that her capacity to manage her affairs
> was diminished.  Therefore, I made an extra effort to carefully explain
> things to her and to make sure I understood her wishes.  Also,
> because of my concern that others might take advantage of her, I
> suggested that Annie Mae Williams enlist the assistance of a
> disinterested third party to assist her in the management of her
> money.  I confirmed this advice, in writing.

(Doc. 108 Ex. 2 ¶ 14.)

      C.    <u>The Original Beneficiaries</u>

      The Release, the UQA, and the annuity certificate each specified that Tiaresa would be a 60% beneficiary and Blondell would be a 40% beneficiary of the monthly annuity payments in the event Annie Mae died during the 15-year guarantee period.  Blondell testified that Annie Mae named Blondell as a beneficiary because Annie Mae had treated Blondell like a daughter, Blondell had taken care of Annie Mae, and Annie Mae had indicated that she wanted to reciprocate.  Both Blondell and Robin explained that, following the explosion and fire, Blondell had visited Annie Mae frequently, had taken Annie Mae to doctor appointments, had provided Annie Mae with meals and transportation, and had paid a few small bills on Annie Mae's behalf.  Blondell and others testified that, like actual family members, Blondell called Annie Mae, "Mom Mae."  (Doc. 108 Ex. 5 ¶ 3.)  Feiber added that based on his twenty or so visits with Annie Mae over the approximate four-year period of his legal representation, "Blondell ... did more to help Annie Mae ... than any other individual."  (Doc. 108 Ex. 2 ¶ 7.)  Two of Blondell's former co-workers, Laura Croft and Barbara Arline, testified that Annie Mae often called Blondell at work to request Blondell's help, and that Annie Mae

treated and referred to Blondell as a daughter.[12]

D.    The Change of Beneficiaries

Although some of the details are disputed, it is clear from the record that whatever relationship that had existed between Annie Mae and Blondell changed immediately after the settlement.  Annie Mae, having cash from the settlement, gave Blondell a $1,000 check for the help Blondell had given her.  Unhappy with this amount, Blondell ripped up the check and threw it at Annie Mae.[13]  Blondell testified that although she had cared for Annie Mae only out of love and not for "the dollar amount," $1,000 did not cover the time and money Blondell had spent on Annie Mae over the preceding four years.  (Doc. 94 Ex. 6 p. 56.)  Annie Mae ended up giving Blondell a second check, this time for $5,000.  Blondell testified that she did not recall what she did with the $5,000, but also testified that she shared some of it with others who had helped Annie Mae.

According to Takita, Tina, Toderick, and Bernard, the incident involving the $1,000 check upset Annie Mae.  Bernard testified that shortly after the settlement, Annie Mae called him, Melva Rose, and a few others to her home to meet with an

---

[12]    Whether Annie Mae truly treated Blondell like a daughter is disputed. Bernard, for example, testified that Annie Mae never referred to Blondell as a daughter, adding, "that's far from the truth."  (Doc. 94 Ex. 8 p. 42:13.)

[13]    Tina was present when Blondell ripped up the check and threw it at Annie Mae.  Blondell does not deny doing so, instead testifying that she does not remember how she returned the check to Annie Mae.

-9-

attorney and sign an affidavit that would allow Bernard and Melva Rose to access Annie Mae's bank accounts and write checks on her behalf.[14]  Bernard testified that, at the meeting, Annie Mae expressed concern that Blondell was trying to "maneuver" Annie Mae out of money, showing Bernard an expense sheet from the state case reflecting payments that Feiber had made to Blondell for tasks that Blondell had performed for Annie Mae.[15]  (Doc. 94 Ex. 8 pp. 14-16.)

For her part, Blondell did not admit a "falling out" with Annie Mae, instead testifying that her visits with Annie Mae became less frequent after the settlement "because of the conflict that the funds had created in [Annie Mae's] home ... All the relatives came forth that had not been there before.  Everybody showed up and wanted [Annie Mae] to do this or do that for them, so all of a sudden everything changed."  (Doc. 94 Ex. 6 p. 59.)  Blondell added that "it was more difficult for us to get together, and we did not see each other as we formerly had.  In conversations, Annie Mae Williams told me that it was difficult for her to see me because it put a strain on her relationship with her family, and that she was just trying to keep

_____

[14]     Bernard and Melva Rose had helped Annie Mae with her financial affairs even before the explosion and fire.  In addition, Blondell had been named on Annie Mae Williams' bank accounts.

[15]     Feiber testified, "On a couple of occasions, a relatively modest amount of money was paid by my firm to Blondell Johnson to partially reimburse her for reasonable transportation expenses incurred by her in transporting Annie Mae Williams and other members of her extended family to school and other activities, and to medical and legal appointments, or on other errands."  (Doc. 108 Ex. 2 ¶ 9.)

peace within the family." (Doc. 108 Ex. 5 ¶ 15.)

Whatever the case, Annie Mae decided to change her original beneficiaries.

The Release addressed how Annie Mae could do so.  Under a provision entitled,

"Plaintiffs' Beneficiary," the Release stated:

> Any payments to be made after the death of any payee in accordance
> with the terms of [the Release] <u>shall be made to the beneficiary
> designated herein or to such beneficiary as may be requested in
> writing by each payee</u> ... <u>to the owner of the annuity</u>. ...  No request
> made under the section nor any revocation thereof shall be effective
> unless it is in writing and delivered to the owner of the annuity.

(Doc. 97 Bates 0021(emphasis added).)  The annuity certificate accounted for a

possible beneficiary change, stating that the annuity owner:

> will have the right at any time to designate the payee, including the
> Beneficiary, to whom benefits are payable under the annuity.
> However, unless the Owner otherwise directs, Metropolitan [MetLife]
> will make all payments under the annuity to the person(s) named in
> the certificate.

(Doc. 97 Bates 0002.)  For its part, the UQA did not specifically account for a

beneficiary change.  It referenced the Release and National Union's obligation to

make periodic payments thereunder, stated that MIAC assumed all of National

Union's liability to make those payments, but added, "The Assignee [MIAC]

assumes no liability to make any payment not specified in Addendum No. 1."

(Doc. 97 Bates 0004.)  "Addendum No. 1," which was drafted at the time of the

settlement, specified the periodic payments to Annie Mae and, in the event of her

death, to Tiaresa and Blondell in respective 60% and 40% shares.  (Doc. 97 Bates

-11-

0005.)

Presumably prompted by an inquiry from Annie Mae or someone acting on

her behalf, MetLife sent Annie Mae a letter on November 9, 1998,[16] stating:

> Enclosed is our Request for Change of Beneficiary form.  Please enter
> the requested beneficiary designation in the space provided, sign and
> date this form and have it notarized then return it to my attention in the
> enclosed self-addressed envelope.
>
> This form will need to be signed by the owner in order for this change
> to be effective unless Owner has previously agreed to allow you to
> change the beneficiary.
>
> Your request is not effective now and will not become effective unless
> and until the Owner signs the form (or otherwise agrees in writing).

(Doc. 97 Bates 0108.)

As instructed by MetLife in the November 9, 1998 letter, Annie Mae or

someone acting on her behalf returned the following document entitled, "Request

for Change of Beneficiary/Amendment to Qualified Assignment ("Beneficiary

Change Request"), dated November 25, 1998, in which Annie Mae requested a

change of her original beneficiary designation, made just three and a half months

prior, from 60% to Tiaresa and 40% to Blondell, to 50% to Tiaresa and 50% to

Takita:

---

[16]     Although the letter includes at the bottom a line stating, "November 9, 1999,"
it appears from the facts that the letter was sent November 9, 1998.  (Doc. 97
Bates 0108.)

REQUEST FOR CHANGE OF BENEFICIARY/AMENDMENT TO QUALIFIED ASSIGNMENT

To be completed by payee.

I, _Annie Mae Williams_, request that the beneficiary for the payments to me under the qualified assignment identified below be changed as follows (please type or print):

_Tiaresa E. Carter and Tukifa Williams To Share Equally_

I may request in writing that Assignor make future changes to this beneficiary designation. Any change of the beneficiary designation will only be made with the Assignee's consent. Assignee will not be liable for any payment made prior to receipt of this or any later request or so soon thereafter that payment could not reasonably be stopped.

I understand that if I have listed more than one individual as beneficiary, payments will be made equally or to the survivor or survivors equally unless otherwise noted.

This change will not be effective until the Assignor (and claimant if different than the payee) has agreed (unless the Assignor (and claimant if different than the payee) has previously agreed with Assignee to allow me to change the beneficiary) and Assignee is not liable to make the change if such agreement cannot be obtained. I understand that Assignee has no responsibility to obtain such agreement and that this is my responsibility.

_Annie Mae W. ____          11-25-98_
(Payee Signature)              (Date)

To be completed by Assignor, Assignee and Claimant (if applicable)

The Qualified Assignment dated _____ between the below signing parties is hereby amended to make the changes as provided above as of the date the last party signs this form. In no event will Assignee be liable for any payment made prior to receipt of this completely executed form or so soon thereafter that payment could not reasonably be stopped.

_____          _____
Assignor                          Date

_____          _____
Assignee                          Date

_____          _____
Claimant (if different than payee)    Date

(Doc. 97 Bates 0016.)

Blondell presented evidence that Annie Mae's arthritis stymied her ability to print clearly, raising the inference that Annie Mae signed the Beneficiary Change Request but did not write the printed words "Annie Mae Williams" and "Tiaresa E. Carter and Takita Williams To Share Equally." (Doc. 97 Bates 0016.) Despite

-13-

questioning several witnesses, Blondell was unable to establish who had written

the printed words, though Melva Rose testified that she helped Annie Mae fill out

forms from time to time.  Having been deposed years after the Beneficiary Change

Request was filled-out, Melva Rose could not "recall definitely if at the time or

anything like that if I filled out the form [Beneficiary Change Request] for her."[17]

(Doc. 97 Ex. 7 p. 21.)

     Takita, Tina, Toderick, and Bernard were all asked about Annie Mae's

mental health at the time she signed the Beneficiary Change Request and

afterward.  They were in agreement that Annie Mae, though elderly and lacking

formal education, was capable and coherent and that her mental health had not

changed in the three and a half month period from the time she signed the

Release to the time she signed the Beneficiary Change Request.[18]  Blondell

---

[17]     Blondell has submitted a bank document that appears to reflect that Annie Mae opened a certificate of deposit on August 19, 1998 in the amount of $100,000 payable on death to Tiaresa and Blondell.  (Doc. 108 Ex. 6.)  A notation on the document reads, "Removing Blondel [sic] per Mrs. Williams and adding Takita Williams AND Willie R. Williams Jr."  (Id.)  It is not entirely clear from the document on which date this change was made, but it appears that it was made on August 28, 1998 with a notation from a bank employee, "Customer changed mind on 8/25/98."  (Id.)  This notation appears to be initialed by Annie Mae.

[18]     Takita testified that Annie Mae was "very coherent" (Doc. 98 p. 61); Toderick testified that Annie Mae was "real capable" and "didn't have any mental problems (Doc. 94 Ex. 9 pp. 16-17); Tina testified that Annie Mae was able to speak clearly, carry on conversations, keep up with her bills, and sometimes know the day of the week (Doc. 94, Ex. 10 pp. 36-37); Bernard testified that Annie Mae was "just a normal person" with "a mind of her own" and not "easily influenced." (Doc. 94 Ex. 8

admitted that Annie Mae was able to carry on conversations, was familiar with current events, talked on the telephone, and did not have a memory lapse during that period.  However, Blondell testified that Annie Mae had become sad and depressed after the settlement.[19]

MetLife received Annie Mae's Beneficiary Change Request and apparently made the determination that National Union was the annuity owner (even though the annuity certificate named MIAC as the annuity owner) and that MetLife was the assignee (even though the Release named MIAC as the assignee).  On December 8, 1998, MetLife sent a letter to National Union enclosing the Beneficiary Change Request and stating:

> Enclosed is an original beneficiary form to be signed by the owner (Nat'l Union & Fire Ins Co. of Pittsburgh).  It was assigned to us on August 7, 1998 [sic] we require that the owner approve a beneficiary change.  Please review and return to us so that we may update our files.

(Doc. 97 Bates 0110.)

---

pp. 39, 41); and Melva Rose testified that Annie Mae "knew what was going on with no problem," "had a mind of her own," and "was very much on top of things"(Doc. 94 Ex. 7 pp. 37, 39-40).

[19]    It is undisputed that Annie Mae was never diagnosed with or treated for depression or any other mental illness.  Blondell's testimony that Annie Mae was depressed was based solely on Blondell's lay person perception and belief. Blondell testified that although she took Annie Mae to doctor's appointments, Blondell never discussed Blondell's concerns about sadness or depression with Annie Mae's doctors.

On December 14, 1999, after a year of delay apparently due to MetLife's futile efforts to get National Union to sign the Beneficiary Change Request, MetLife sent a letter to The Pension Company, a structured settlement business and broker of the annuity certificate, enclosing the Beneficiary Change Request and stating:

> As per our conversation find [sic] request for change in beneficiary from the above referenced annuitant.  Please forward to the owner (AIG),[20] for there [sic] approval and return to my attention at your earliest convenience.

(Doc. 97 Bates 0030.)

On December 20, 1999, The Pension Company sent a letter to "Structured Settlement Department, AIG Claim Services, Inc." enclosing the Beneficiary Change Request and stating:

> Change of Beneficiary.  This file was assigned to MetLife on August 7, 1998 but MetLife requires that the Assignor approve a beneficiary change.  MetLife has been trying to send this request to several National Union ... offices, as you can see by the date on the request. They have assured me that even though this request is over a year old and has not been signed by the Assignor, they would have honored the change in the event of Annie Mae Williams['] death.

(Doc. 99 Ex. F.)

On December 28, 1999, The Pension Company sent a letter to MetLife enclosing the Beneficiary Change Request, now signed in the "Assignor" block by

---

[20]    There is nothing in the record explaining AIG's relationship to the annuity certificate or with the parties.

-16-

a National Union representative, and stating: "Enclosed please find an

authorization **signed by the owner** of the above referenced annuity to effect the

following change: ... Change of Beneficiary" ...  Please make the appropriate

change and retain the original for your records.  We have changed our records."

(Doc. 99 Ex. G (emphasis in original).)[21]

Finally, on January 3, 2000, over a year after Annie Mae sent the

Beneficiary Change Request to MetLife, MetLife sent Annie Mae a letter stating:

"We have updated our files to change your beneficiary as you requested to Tiaresa

E. Carter & Takita Williams equally."  (Doc. 97 Bates 0107.)  There was no other

communication between Annie Mae and MetLife, MIAC, National Union, or The

Pension Company regarding beneficiaries.

E.    The Last Years of Annie Mae's Life

Sometime in late 2001 or early 2002, Annie Mae got Willie more involved in

her financial affairs, and Bernard and Melva Rose discontinued their involvement.

According to Bernard, "Annie Mae saw that her health was failing and she wanted

to make her final determination, and so what she wanted to do is she assigned

[Willie] as a beneficiary to everything, and he took over the account."  (Doc. 94 Ex.

8 p. 17.)  Blondell has submitted copies of eight checks signed by Willie during this

period that he made out to Takita or himself in amounts ranging from $100 to

---

[21]     There was no signature in the "Assignee" block.

$500.[22]  Willie signed many other checks on Annie Mae's account, many of which appear to be checks for Annie Mae's utility services and for "cash."  (Doc. 108 Ex. 7.)  Blondell also has submitted a bank document that appears to reflect that, on June 28, 2002, the account holders on a certificate of deposit originally issued on February 3, 2000 in the amount of $10,570.54 were changed from Annie Mae, Willie, Tiaresa, and Takita to just Annie Mae and Willie.  (Doc. 108 Ex. 6.)

In July 2002, Annie Mae signed her "Last Will and Testament" in which she appointed Willie as her personal representative and Takita as the alternate; stated her desire for Willie, Takita, and Tiaresa to be in charge of her funeral arrangements; bequeathed her trailer to Tiaresa, Tina, and Toderick; bequeathed her interest in the land to Willie and Brune Williams (Willie's son and Takita's brother); bequeathed her monetary assets to Willie, Tiaresa, and Takita; and bequeathed the remainder of her assets to Willie, Brune, and Takita.[23]  (Doc. 94 Ex. 3.)  Present when Annie Mae signed the Last Will and Testament were two

---

[22]  Two of the checks were made out within weeks of Annie Mae's death.

[23]  Melva Rose testified that she and an attorney helped Annie Mae draft a similar will at Annie Mae's house in 2000.  Melva Rose recalled that, at the time, Annie Mae wanted her land and bank accounts to go to Willie, her trailer to go to Tiaresa, Toderick, and Tina, and her insurance proceeds to Willie, Tiaresa, Toderick, and Tina.  Other witnesses gave similar testimony about Annie Mae's expressions of to whom she wanted to leave her assets.  Tina testified that Annie Mae always told her she wanted her beneficiaries to be Tina, Tiaresa, Toderick, and Takita.  Bernard testified that Annie Mae told him that she was changing the beneficiaries of her monthly annuity payments to Willie.

-18-

witnesses, an attorney, Annie Mae, Willie, and Takita.  According to Blondell, the attorney had been Willie's attorney.

Blondell testified that, around the same time, Annie Mae called Blondell crying, explaining that Annie Mae had changed the annuity beneficiaries because "they had insisted that she do it, the relatives had."  (Doc. 94 Ex. 6 p. 66.)  Blondell testified that she did not ask Annie Mae who "they" were because Blondell knew Annie Mae "wasn't in the mood to discuss it."  (Doc. 94 Ex. 6 p. 69.)  However, Blondell also testified that Annie Mae told Blondell that it was Willie who insisted Annie Mae change the annuity beneficiaries so that the money would stay in the family.  In an affidavit submitted after her deposition, Blondell was more specific:

> Annie Mae Williams advised me that she was very concerned about providing a home for Gloria's children, Tiaresa, Tina, and Tod.  She wanted to place a real home (not a mobile home) on the property, but was not able to do that because she could not acquire sole interest in the property (she couldn't sort out the property).  Annie Mae Williams advised me that, in particular, 'Pops' [Willie] used his ownership interest in the property to pressure her to eliminate the bequest she had originally made to me, and to, instead, grant that bequest to Willie 'Pops" Williams' daughter, Takita.  She also stated that the family or the relatives pressured her to keep her money in the family, and to change the bequest to me, because I was not a member of the immediate family.

(Doc. 108 Ex. 5 ¶ 18.)[24]

---

[24]   Toderick, Tina, Bernard, and Melva Rose testified that they never heard Willie ask Annie Mae to change the annuity beneficiaries or threaten to take away her home.  Bernard added that Willie, "would never do that."  (Doc. 94 Ex. 8 p. 41-42.)

-19-

In her response to Takita's requests for admission, Blondell admitted that Takita, individually, never exerted coercion or duress on Annie Mae to get Annie Mae to change her beneficiaries and that Blondell did not know whether Takita instructed Willie to act on her behalf to do so.  Takita testified that she moved out of Lake City when she married in 1998 and never talked to Willie or anyone else about Annie Mae's estate except when Annie Mae signed her Last Will and Testament in 2002.

F.      The Beneficiary Dispute

Annie Mae died on August 14, 2002; thus began the dispute between Tiaresa, Blondell, and Takita over entitlement to the future monthly annuity payments for the remainder of the 15-year guarantee period.[25]  On September 5, 2002, joint counsel for Tiaresa and Blondell wrote MetLife to provide a copy of Annie Mae's death certificate and claim entitlement to respective 60% and 40% shares.  Sometime shortly thereafter, around October 2002, Tiaresa called Takita and told her that a MetLife "Service Representative" named Angie Placide indicated that Takita was a beneficiary.  (Doc. 97 Bates 0095.)  Takita, who had not known about Annie Mae's Beneficiary Change Request, was "shocked" and called Placide the next day to find out more about her beneficiary status.  (Doc. 98

_____

[25]     On September 12, 2002, Annie Mae's Last Will and Testament was admitted into probate and Willie was appointed as the personal representative.

p.44:4.)  Placide apologized to Takita, indicated that she had made a mistake, and

advised Takita that the portion of the UQA stating that MIAC  "assume[d] no

liability to make any payment not specified in Addendum No. 1" barred Annie

Mae's Change of Beneficiary Request.  (Doc. 97 Bates 0004.)  Thus, MetLife

began and continued the monthly annuity payments 60% to Tiaresa and 40% to

Blondell as per the original beneficiary designations made at the settlement.[26]

    On March 9, 2003, Takita wrote counsel for Annie Mae's estate to explain

Annie Mae's Beneficiary Change Request and MetLife's response.  Takita later

retained her own counsel and, on October 22, 2003, he sent a letter to MetLife

_____

[26]     Since Placide was not deposed, it is unclear from the record whether
MetLife as a company made an affirmative determination as to the effectiveness of
the Beneficiary Change Request or whether it simply did not reference the
Beneficiary Change Request when it began paying Tiaresa and Blondell.  MetLife's
claim file  does not shed light on the matter.  On one document therein, Placide
apparently made a handwritten note on October 4, 2002, stating, "I spoke with
Ruth ... concerning Bene on SA + UQA [sic] her advice to me was to make
payment based on both documents."  (Doc. 97 Bates 0228.)  On another
document therein, a representative from The Pension Company wrote MetLife on
August 11, 2003, with the following statement: "Per our discussion on July 28,
2003, you stated that the beneficiaries are being paid and they are Tiaresa E.
Carter (60%) and Blondell Johnson (40%).  On 12/28/99 we forwarded a change in
beneficiary, signed by owner, National Union Fire Insurance Company.  New
beneficiaries are: Tiaresa E. Carter and Takita Williams to share equally.  We had
asked that this matter be reviewed and verified. ...  We have a letter from an
attorney for someone contesting Anna [sic] Mae Williams' will.  Please respond as
soon as possible."  (Doc. 97 Bates 0008.)  A handwritten notation on the letter had
an arrow pointing to the statement that there was a change in beneficiary and
stating, "No Rescind on file."  (Doc. 97 Bates 0008.)

-21-

claiming for Takita entitlement to a 50% share pursuant to Annie Mae's Beneficiary Change Request.[27]  At this point, MetLife ceased making monthly annuity payments all together.

G.    The Interpleader Case

Approximately 10 months after MetLife's cessation of payments, in August 2004, MetLife and MIAC filed this interpleader case.[28]  Tiaresa, Blondell, and Takita responded with their individual counterclaims for breach of contract. Blondell also filed her cross-claim for interference with an expectancy against Takita.  Tiaresa's counterclaim was resolved with MetLife's and MIAC's agreement to pay her 50% of the accrued monthly annuity payments, representing the least accrued amount owed to Tiaresa under any interpretation of the documents.[29]

───────────────────────

[27]    Takita testified that the delay between her first contact with MetLife in October 2002 and her counsel's letter in October 2003 was caused by her inability to pay attorneys from whom she sought help.

[28]    It is unclear from the record why MetLife and MIAC took so long to file the interpleader case and whether they were actively communicating with Tiaresa, Blondell, and Takita during this period.  At some point after MetLife stopped making payments, counsel for Blondell wrote MetLife to ask why Blondell was no longer receiving monthly checks.

[29]    The Court earlier granted Tiaresa's consent motion to dismiss with prejudice her counterclaim against MetLife and MIAC.  (Doc. 90.)  At the hearing, there was some discussion about whether Tiaresa's settlement with MetLife and MIAC applied only to accrued monthly payments or also applied to future monthly payments.  Following the hearing, Tiaresa moved to be dismissed entirely from the lawsuit, explaining that her settlement included the future monthly payments and that she had no interest in litigating the remaining issues or in spending additional

-22-

The total monthly annuity payments accrued by MetLife, from October 22, 2003 (when MetLife stopped paying) to September 1, 2005 (when MetLife filed its dispositive motions) are $62,480.  After past monthly annuity payments are reduced by 50% to Tiaresa, the remainder of past monthly annuity payments is $31,240.  By Order dated October 14, 2005 (Doc. 113), the Court granted MetLife and MIAC leave to deposit this amount and any other accrued amounts to date in the Court registry, which MetLife and MIAC proceeded to do (Doc. 117).  After future monthly annuity payments likewise are reduced by 50% representing future payments due Tiaresa, the remainder of the future monthly annuity payments is $1,420 until July 15, 2013, the end of the 15-year guarantee period.

MetLife and MIAC now move for interpleader of the accrued funds and a declaration of the proper beneficiaries thereof.  MetLife and Takita cross move for summary judgment on Takita's counterclaim against MetLife for breach of contract.  MetLife and MIAC move for summary judgment on Blondell's counterclaim against MetLife and MIAC for breach of contract.  Takita moves for summary judgment on Blondell's cross-claim against Takita for interference with an expectancy.  The Court will discuss each of these motions in turn.

_____

attorneys' fees and costs associated with doing so.  (Doc. 114-1.)  Given the final disposition of the other pending motions, the Court will deny Tiaresa's most recent motion to dismiss as moot.

**II.    Discussion**

   A.    The Motion for Interpleader

   Interpleader is a device that allows a stakeholder to bring an action joining

two or more adverse claimants to a single fund.  In re Mandalay Shores Co-op.

Housing Ass'n, Inc., 21 F.3d 380, 383 (11th Cir. 1994).  The purpose of

interpleader is to protect a stakeholder from the possibility of defending multiple

claims.  Relistar Life Ins. Co. v. Knighten, No. 504CV221OC10GRJ, 2005 WL

1309411, at *3 (M.D. Fla. June 1, 2005);  see also Fulton v. Kaiser Steel Corp.,

397 F.2d 580, 582-583 (5th Cir. 1968) ("[T]he gist of the relief sought is the

avoidance of the burden of unnecessary litigation or the risk of loss by the

establishment of multiple liability when only a single obligation is owing.").[30]

Interpleader is liberally construed to effectuate this purpose.  Relistar, 2005 WL

_____

[30]    MetLife and MIAC filed their interpleader complaint and motion under both
Federal Rule of Civil Procedure 22 and 28 U.S.C. § 1335.  These provide
independent bases for bringing an interpleader action; their primary difference lies
in their respective jurisdictional prerequisites.  See Allstate Ins. Co. v. Young, 923
F. Supp. 1559, 1561 (S.D. Ga. 1996)(explaining differences between rule and
statutory interpleader).  At the hearing, the parties represented that they did not
believe that diversity jurisdiction necessary for rule interpleader existed because
the accrued monthly annuity payments did not meet the $75,000 threshold.  It is
unnecessary to determine whether the parties are correct on this point because
the Court has satisfied itself that it has jurisdiction under statutory interpleader.
The amount in controversy easily meets the $500 threshold, at least two of the
claimants are diverse (Tiaresa is a Texas citizen and the others are Florida
citizens), and MetLife and MIAC have now deposited the disputed accrued monthly
annuity payments into the Court's registry.  See 28 U.S.C. § 1335.

1309411, at *3 (quoting Matter of Bohart, 743 F.2d 313, 325 (5th Cir. 1984)).

The party seeking interpleader has the burden of establishing that it is an appropriate mechanism for resolving a dispute.  Dunbar v. U.S., 502 F.2d 506, 511 (5th Cir. 1974).  Interpleader is appropriate when there are two or more adverse claimants to a limited fund.  28 U.S.C. § 1335(a)(1); see also Dunbar, 502 F.2d at 511 ("[A] prerequisite for [an interpleader] action is that the party requesting interpleader demonstrate that he has been or may be subject to adverse claims.").  As MetLife and MIAC emphasize, interpleader does not depend on the merits, or lack thereof, of the competing claims.  Relistar, 2005 WL 1309411, at *3 n.6.

MetLife and MIAC assert that interpleader is appropriate in this case because Takita and Blondell, individually, claim entitlement to the same part of the accrued and future monthly annuity payments and MetLife and MIAC therefore could be exposed to double liability if they make those payments to one over the other.  Neither Blondell nor Takita dispute MetLife's and MIAC's assertion; nevertheless, they argue that interpleader, which is equitable in nature, is inappropriate because MetLife and MIAC are not disinterested stakeholders deserving of interpleader protection and, in fact, have acted with unclean hands by inconsistently informing Annie Mae that her Beneficiary Change Request had been effectuated but later representing that the UQA between MIAC and National Union barred any beneficiary change.  MetLife and MIAC respond that they indeed are

-25-

disinterested stakeholders insofar as they do not claim entitlement to the accrued or future monthly annuity payments and did not create the conflict between Blondell and Takita, pointing out that Blondell and Takita made their respective claims independent of MetLife's payments to Blondell.  MetLife and MIAC further point out that they had nothing to do with Blondell's undue influence claim against Takita.

        The Court disagrees with Blondell and Takita that interpleader can be applied only when a disinterested stakeholder is involved, or when there has been no finding of unclean hands.  The parties have not pointed to any recent or Eleventh Circuit cases addressing this issue, but it appears that modern interpleader analyses focus not on the stakeholder's interest or lack thereof, but on the "threat of multiple vexation."  7 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1706 (3d ed. 2005).  Indeed, "[c]ontemporary procedure, with its flexible and liberal provisions for joinder of parties and claims, for separate trial of separate issues, for assuring that the right to a jury trial on a particular issue or claim is not impaired, and for shaping relief to the necessities of the particular case is well adapted to disposing of interpleader cases even when independent liability [of the stakeholder] is asserted."  Id.; see also Homestead Title of Pinellas, Inc. v. United States, No. 8:03-CV-02616-SCBMAP, 2005 WL 1221865, at *3 (M.D. Fla. Apr. 8, 2005)(concluding interpleader appropriate even if stakeholder

was interested).

Finding that MetLife and MIAC are faced with competing claims by Blondell and Takita for the same portion of the monthly annuity payments such that MetLife and MIAC may be exposed to double liability, and further finding that interpleader is appropriate regardless of whether MetLife and MIAC are interested stakeholders or have acted with unclean hands, the Court will grant interpleader to the extent that it brings all of the interested parties together in this one case so that future litigation will be avoided.  In so doing, the Court will grant MetLife's and MIAC's request to declare the correct beneficiaries of the monthly annuity payments.

The parties agree that Florida contract law governs interpretation of the Release, the UQA, and the annuity certificate.  The Court will consider these documents together in determining their meaning and effect since they were all part of a single structured settlement.  J.G. Wentworth, S.S.C., L.P. v. Safeco Life Ins. Co., 755 So. 2d 138, 138-139 (Fla. 4th DCA 1999)("Where documents are executed as part of the same transaction they should be considered together in determining their meaning and effect.")(citing Florida cases).  MetLife, MIAC, and Blondell do not take a position on their meaning and effect.  Takita and Willie (as personal representative of Annie Mae's estate) assert that Takita is the correct beneficiary over Blondell.

By its clear terms, the Release between National Union and Annie Mae

-27-

allowed Annie Mae to change her beneficiaries by written notification to MIAC.

The Court finds that Annie Mae did so through her Beneficiary Change Request.

Although Annie Mae sent it to MetLife at MetLife's explicit instruction, MetLife and

MIAC, before and throughout this litigation, have acted as one and the same.[31]

Indeed, counsel for MetLife and MIAC acknowledged at the hearing that Annie

Mae followed the correct steps in seeking to change her beneficiaries.  MIAC, as

the assignee of the obligation under the Release to make the monthly annuity

payments, had the duty to make payments in accordance with Annie Mae's

Beneficiary Change Request; that is, 50% to Tiaresa and 50% to Takita.  The UQA

was between National Union and MIAC only, and accordingly does not operate to

modify or restrict Annie Mae's right to change beneficiaries as set forth in the

Release.[32]  As such, the correct beneficiaries under the Release, the UQA, and the

_____

[31]     The record does not reflect the corporate relationship between MetLife and MIAC.  However, they are represented by the same counsel in this case and often are referred to without distinction.  Counsel for MetLife and MIAC acknowledged at the hearing that MetLife and MIAC are the same in this case as a practical matter. It appears that National Union paid MIAC $363,592 for the "annuity purchase" (Doc. 97 Bates 0072) and MIAC paid MetLife "$1.00 + consideration" for the annuity (Doc. 97 Bates 0069).  In the correspondence relating to the Beneficiary Change Request, MetLife took the position that MetLife was the assignee of the Release obligations and that National Union was both the assignor of the Release obligations and the annuity owner.

[32]     The Beneficiary Change Request, an apparent form document, obviously was intended to amend the UQA between National Union and MIAC.  Its title included, "Amendment to Qualified Assignment" and its body included signature blocks for the "Assignor" (National Union) and the "Assignee" (MIAC) under the

-28-

annuity certificate are Tiaresa and Takita in equal shares.[33]

Within their motion for interpleader, MetLife and MIAC request an order dismissing them from the case with prejudice and granting them an injunction barring Tiaresa, Blondell, Takita, and Willie from instituting any other action over the monthly annuity payments.  The Court will deny these requests as unnecessary and instead will adjudicate specific relief in this Order.

MetLife and MIAC also request their attorneys' fees and costs out of the accrued monthly annuity payments.  Although neither rule nor statute provides for attorneys' fees and costs in interpleader cases, "[f]ederal practice ... has followed the traditional equity rule that gives the trial court discretion to allow a disinterested stakeholder to recover costs and attorney's fees from the stake itself ...  The court's 'authority to make an award is discretionary; there is no right for the

---

statement that the UQA "is hereby amended to make the [beneficiary] changes as provided above as of the date the last party signs this form.  In no event will [MIAC] be liable for any payment made prior to receipt of this completely executed form or so soon thereafter that payment could not be reasonably stopped."  (Doc. 97 Bates 0016.)

[33]     MetLife and MIAC amended their original complaint to add a claim for unjust enrichment against Tiaresa and Blondell for any incorrect payments made to them. (Doc. 47.)  It appears that MetLife and MIAC have abandoned this claim given that they settled with Tiaresa, did not raise it in their motion or at the hearing, and asked in their motion to be dismissed from this case with prejudice.  Even without abandonment, the Court would be hard pressed to find in favor of MetLife and MIAC under the facts recited herein given the equitable nature of unjust enrichment.

-29-

stakeholder to recover costs and attorney's fees.'" <u>Life Investors Ins. Co. of Am. v. Childs</u>, 209 F. Supp. 2d 1255, 1256 (M.D. Ala. 2002)(quoting 4 James Wm. Moore, <u>Moore's Federal Practice</u> § 22.06 (3d ed. 2002))(citations omitted); <u>see</u> <u>also</u> <u>Prudential Ins. Co. of Am. v. Boyd</u>, 781 F.2d 1494, 1497 (11th Cir. 1986)("In an interpleader action, costs and attorneys' fees are generally awarded, in the discretion of the court, to the plaintiff who initiates the interpleader as a mere disinterested stakeholder.").

The Court will use its discretion to deny MetLife's and MIAC's request for attorneys' fees and costs for two independent reasons.  First, the Court finds that MetLife and MIAC are not the paradigm innocent stakeholders that find themselves by happenstance in the midst of a morass between adversaries.  Instead, they took inconsistent positions with respect to their own documents, then waited almost two years after their undisputed knowledge of competing claims to file this interpleader case, meanwhile leaving in the lurch individuals unschooled in the minutiae of annuities.  <u>See</u> <u>Wright & Miller</u>, <u>supra</u>, at § 1709 (explaining that courts have taken cognizance of stakeholder's inequitable activity by granting the interpleader request but denying the stakeholder any attorneys' fees and costs out of the fund).  Second, the Court finds that this interpleader case involves circumstances arising "out of the normal course of business" for MetLife and MIAC, under which attorneys' fees and costs are unwarranted.  As the Eleventh Circuit

explained:

> The principle behind the normal-course-of-business standard is
> simple: an insurance company, for example, avails itself of
> interpleader to resolve disputed claims to insurance
> proceeds--disputes that arise with some modicum of regularity.  In a
> sense, the insurance company will use interpleader as a tool to
> allocate proceeds and avoid further liability.  As the costs of these
> occasional interpleader actions are foreseeable, the insurance
> company easily may allocate the costs of these suits to its customers.
> Unlike innocent stakeholders who unwittingly come into possession of
> a disputed asset, an insurance company can plan for interpleader as a
> regular cost of business and, therefore, is undeserving of a fee award.

In re Mandalay, 21 F.3d at 383.  This rationale undoubtedly applies here; MetLife
and MIAC have not attempted to explain why it should not.

>    B.    The Counterclaims and Cross-claim

>         1.    **The Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that the moving party is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining
whether summary judgment is appropriate, a court must draw inferences from the
evidence in the light most favorable to the non-movant and resolve all reasonable
doubts in that party's favor.  See Centurion Air Cargo, Inc. v. United Parcel Serv.
Co., 420 F.3d 1146, 1149 (11th Cir. 2005).

### 2.    The Counterclaims by Blondell and Takita

Blondell's counterclaim for breach of contract against MetLife and MIAC, and a portion of Takita's counterclaim for breach of contract against MetLife, are based on MetLife's withholding of monthly annuity payments from both of them following its October 22, 2003 receipt of Takita's attorney's letter claiming Takita's 50% entitlement.  Takita concedes MetLife's argument that, if interpleader is granted, MetLife is entitled to summary judgment on this portion of her counterclaim.  For this argument, MetLife cited U.S. Trust Co. of N.Y. v. Alpert, 10 F. Supp. 2d 290, 307 (S.D.N.Y. 1998)("[Claimants] have not cited to any authority supporting the proposition that the proper commencement of an interpleader action may in itself give rise to a counterclaim against the stakeholder for failing, instead, to have paid the moneys out to the counterclaiming defendant without benefit of court adjudication of conflicting claims among defendants.") and Lutheran Bro. v. Comyne, 216 F. Supp. 2d 859, 862-63 (E.D. Wisc. 2002)("[The] counterclaims are essentially based on the plaintiff's [sic] having opted to proceed via interpleader complaint rather than having chosen from among competing adverse claimants. Courts have consistently rejected such counterclaims where, as here, the plaintiff was entitled to pursue interpleader relief.")(citing cases).[34]  Given Takita's

_____

[34]    None of the parties raises the interesting issue of whether resort to federal rule or statutory interpleader can obviate an otherwise valid state law cause of action.

concession, the Court will grant summary judgment in favor of MetLife on the

portion of Takita's counterclaim involving MetLife's withholding of payments that

came due from October 22, 2003 to present.  The Court will grant summary

judgment in favor of MetLife and MIAC on Blondell's entire counterclaim given the

Court's declaration that Takita, not Blondell, is the correct beneficiary.

### 3.     The Remaining Portion of the Counterclaim by Takita

The remaining portion of Takita's counterclaim for breach of contract against

MetLife is based on MetLife's unauthorized payment of a portion of the monthly

annuity benefits to Blondell following Annie Mae's death on August 14, 2002 and

up to October 22, 2003 when it began withholding all payments.  Takita argues

that summary judgment on this portion is appropriate because the undisputed

evidence shows her entitlement to those payments and MetLife's failure to make

them to her.  MetLife does not directly respond to Takita's argument, instead

asserting that Fla. Stat. § 627.423 bars Takita from recovering any payments

made before Takita's October 22, 2003 written claim.

Section 627.423 states:

> Whenever the proceeds of or payments under a life or health
> insurance policy or annuity contract become payable in accordance
> with the terms of such policy or contract, or the exercise of any right or
> privilege thereunder, and the insurer makes payment thereof in
> accordance with the terms of the policy or contract or in accordance
> with any written assignment thereof, the person then designated in the
> policy or contract or by such assignment as being entitled thereto shall

> be entitled to receive such proceeds or payments and to give full
> acquittance therefor; and such payments shall fully discharge the
> insurer from all claims under the policy or contract unless, before
> payment is made, the insurer has received at its home office written
> notice by or on behalf of some other person that such other person
> claims to be entitled to such payment or some interest in the policy or
> contract.

Fla. Stat. § 627.423 (2005).

Without citation to legislative history, MetLife states that § 627.423 "is designed to encourage the prompt payment of insurance and annuity benefits by allowing insurers to pay and be discharged when no adverse claim has been filed." (Doc. 96-1 p. 15.) MetLife argues that § 627.423 applies whenever a claimant fails to give the insurer written notice of a claim regardless of whether the insurer had actual knowledge or even had acknowledged the claim. Further, citing to the portion of the statute stating, "any written assignment thereof," MetLife argues that § 627.423 applies whenever an insurer makes payment to any beneficiary named in the file, not just the most recent or correct beneficiary.[35]

Takita responds that § 627.423 applies only when an insurer makes payment in accordance with the terms of the policy or contract, and that MetLife did not do so. Takita further responds that MetLife had written notice of the claim, made "on her behalf," via the Beneficiary Change Request sent to MetLife by

---

[35]     Counsel for MetLife and MIAC appeared to somewhat retreat from this position at the hearing, at one point stating that there would have to be some "good faith" on the part of the insurer in choosing which beneficiary to pay.

-34-

Annie Mae.  Takita also urges the Court to reject as absurd MetLife's construction of "any written assignment thereof," to mean "any written beneficiary designation in the file."  In addition to distinguishing "assignment" from "beneficiaries," Takita says incredulously, "Metropolitan believes it can make payment to any of a potential number of beneficiaries regardless of the express intent of the insured and still be afforded the protections of [§] 627.423."  (Doc. 100 p. 12.)

The parties cite only one case applying § 627.423 or its predecessor.  See Loewer v. N.Y. Life Ins. Co., 805 F. Supp. 956, 958 (M.D. Fla. 1992)(holding that § 627.423 discharged insurer from claims made for the first time in lawsuit where insurer paid policies in accordance with their terms).  That case is irrelevant to the issues raised by the parties here.  Other cases, apparently decided after § 627.423 or its predecessor but without citation thereto, have held that an insurer is protected from liability for payment to a beneficiary only where it has done so in good faith and without notice of another beneficiary.  See  Hoffman v. White, 277 So. 2d 290, 292-93 (Fla. 4th DCA 1973)(holding life insurer not entitled to discharge of liability by fact that it paid policy proceeds in good faith to named beneficiary where insurer had been on notice two weeks prior to making payment that curator of decedent's estate was going to file suit seeking a judicial determination of entitlement to insurance proceeds); Weed v. Equitable Life Assur. Soc'y of U.S., 288 F.2d 463, 464-65 (5th Cir. 1961)("Payment in good faith to the

beneficiary of record by the insurance company without knowledge of facts vitiating the claim will prevent a second recovery by another claimant.")(applying Florida law).

The Court finds that Takita has the better arguments and therefore rejects MetLife's attempt to seek the protection of § 627.423.  The plain language of § 627.423 makes it applicable only when an insurer makes payment "in accordance with the terms of [the] policy or contract."  Fla. Stat. § 627.423.  As discussed above, MetLife acknowledged, accepted, and effectuated Annie Mae's Beneficiary Change Request well before Annie Mae died but did not make payments in accordance therewith.  As Takita points out, MetLife's proposed construction of § 627.423, which would allow an insurer protection if it makes payment to any previous beneficiary - - not just the most recent one on file - - would be absurd. Had MetLife wanted protection, it could have withheld payments upon receipt of Annie Mae's death certificate and immediately filed this interpleader case.  Instead, MetLife made unauthorized payments to Blondell who MetLife itself had acknowledged was no longer entitled to them.  For these reasons, the Court will grant Takita's motion for summary judgment on her breach of contract counterclaim for 50% of the monthly annuity payments that became due during the period from September 2002 (the month after Annie Mae died) to October 2003 (the month MetLife and MIAC ceased making payments all together), in the

-36-

amount of $18,460 (13 months multiplied by $1,420).[36]  The Court will retain

jurisdiction to hear any motion by Takita for pre-judgment interest on this amount.

     C.   <u>The Cross-Claim by Blondell</u>

     Blondell's cross-claim against Takita is for interference with an expectancy

interest.  Blondell asserts that Takita, through Willie (and perhaps other family

members), acting as Takita's agent(s), unduly influenced Annie Mae to eliminate

Blondell and add Takita as a beneficiary of the monthly annuity payments.  Takita

moves for summary judgment on the cross-claim, arguing that Blondell has not

presented facts sufficient to create a triable issue on either undue influence or

agency.

     Florida common law recognizes the tort of intentional interference with an

expectancy interest.  <u>DeWitt v. Duce</u>, 408 So. 2d 216, 218 (Fla. 1981); <u>Davison v.

Feuerherd</u>, 391 So. 2d 799, 801 (Fla. 2d DCA 1980).  This tort is based partially on

the Restatement Second of Torts § 774B which provides, "One who by fraud,

duress, or other tortious means intentionally prevents another from receiving from

a third person an inheritance or gift that he or she would otherwise have received

is subject to liability to the other for loss of the inheritance. ..."  <u>Chase v. Bowen</u>,

---

[36]    Takita requested $18,460 in her Rule 26(A)(1) disclosures (Doc. 96-2 p. 2)
so that is what the Court will award.  The Court's own calculations came to
$21,300, or the amount that the Court believes was due for the period between
August 14, 2002 to October 22, 2003 if payments were due mid-month.

771 So. 2d 1181, 1186 (Fla. 5th DCA 2000)(Sharp, J., dissenting).

An individual claiming intentional interference with an expectancy interest must prove: (1) the existence of an expectancy; (2) intentional interference with the expectancy through tortious conduct such as duress, fraud, or undue influence; (3) causation; and (4) damages.  Claveloux v. Bacotti, 778 So. 2d 399, 400 (Fla. 2d DCA 2001); Whalen v. Prosser, 719 So. 2d 2, 5 (Fla. 2d DCA 1998); Allen v. Leybourne, 190 So. 2d 825, 829 (Fla. 3d DCA 1966).  Blondell and Takita focus their respective arguments on the second factor and, more specifically, on undue influence.

Florida cases involving allegations of undue influence in the will context apply to cases arising in other contexts.  Taylor v. Johnson, 581 So. 2d 1333, 1334 (Fla. 1st DCA 1990).  In the will context, Florida courts have approved the following meanings of "undue influence" which distinguish mere "influence" that is not actionable from "undue influence" which is:

> Influence to be undue, so as to invalidate a will, must amount to fear, overpersuasion, force or coercion to the extent of destroying the free agency and will power of the testator and must be operative on the mind of the testator at the time the will is executed.
>
> ...
>
> To constitute 'undue influence,' the mind must be so controlled or affected by persuasion or pressure, artful or fraudulent contrivances, or by the insidious influence of persons in close confidential relations with him, that he is not left to act intelligently, understandingly, and voluntarily, but subject to the will or purposes of another.

-38-

Id. at 1334-35 (quotations omitted); see also Raimi v. Furlong, 702 So. 2d 1273, 1287 (Fla. 3d DCA 1997)("When a will is challenged on the grounds of undue influence, the influence must amount to over persuasion, duress, force, coercion, or artful or fraudulent contrivances to such an extent that there is a destruction of free agency and willpower of the testator.").

The Florida Supreme Court long ago held that because of the difficulty of obtaining direct evidence of undue influence, an individual claiming undue influence can satisfy his or her initial burden of proof by presenting facts sufficient to raise a presumption thereof.  In re Estate of Carpenter, 253 So. 2d 697, 701 (Fla. 1971).  A presumption of undue influence arises when a beneficiary: (1) had a confidential relationship with the decedent at the time the alleged undue influence occurred; and (2) actively procured the bequest.  In re Estate of Stetzko, 714 So. 2d 1087, 1090 (Fla. 4th DCA 1998).[37]  The parties dispute only the second element required for a presumption of undue influence to arise; that is, active

---

[37]     If the individual claiming undue influence presents sufficient evidence to raise a presumption, the burden of proof shifts to the beneficiary to prove the absence of undue influence.  Hack v. Janes, 878 So. 2d 440, 442 (Fla. 5th DCA 2004).  Carpenter was superceded by statute to the extent Carpenter prohibited a shifting of the burden of proof in cases in which a presumption of undue influence arises.  See Fla. Stat. § 733.107(2)(2005)("The presumption of undue influence implements public policy against abuse of fiduciary or confidential relationships and is therefore a presumption shifting the burden of proof ... .").  However, the statute did not affect the elements necessary to create a presumption of undue influence in the first instance.  Hack, 878 So. 2d at 443.

procurement.[38]

Active procurement has been defined by reference to the definition of "procure," that is, "[t]o get by special effort; [to] obtain or acquire ...; [t]o bring about; [to] effect ...."  Davis v. Foulkrod, 642 So. 2d 1129, 1134 (Fla. 4th DCA 1994)(citing American Heritage Dictionary of the English Language 1445 (3d ed. 1992)).  In the will context, the Florida Supreme Court has listed the following nonexclusive factors as "warning signals pointing to active procurement": (1) the presence of the beneficiary at the execution of the will; (2) the presence of the beneficiary on those occasions when the testator expressed a desire to make a will; (3) a recommendation by the beneficiary of an attorney to draw the will; (4) knowledge of the contents of the will by the beneficiary prior to execution; (5) giving of instructions on preparation of the will by the beneficiary to the attorney drawing the will; (6) securing of witnesses to the will by the beneficiary; and (7) safekeeping of the will by the beneficiary subsequent to execution.[39]  Carpenter,

_____

[38]  "The term confidential relationship encompasses those informal relationships based upon the trust or confidence one person reposes in another, as well as the more exacting fiduciary relationship between attorney and client." Estate of Brock, 692 So. 2d 907, 911 (Fla. 1st DCA 1996).  Takita admits that she and Willie had a "confidential relationship" with Annie Mae in that all three were very close.  (Doc. 93 p. 17 n. 6.)

[39]  Blondell argues that a showing of active procurement is not required in cases that do not involve a will contest because, in those cases, the Carpenter factors will not be present.  However, Florida courts have stressed that these factors are merely guidelines.  See, e.g., Newman v. Brecher, 887 So. 2d 384, 386

253 So. 2d at 702.  Obviously, these factors are abstractions in cases that do not

involve a will contest.  See Davis, 642 So. 2d at 1134 (undertaking active

procurement analysis with respect to allegation of undue influence over joint

survivorship account and noting that Carpenter factors are of doubtful applicability

in that context).

Mental capacity comes into play in both the active procurement and undue

influence analyses.  One Florida court has explained: "[T]he inequality of mental

capacity and strength between the testatrix and the party with the confidential

relationship is a factor in determining active procurement. ... [The testatrix's] failed

mental capacity ... is a factor which should be considered as supporting the undue

influence claim."  Hack v. Estate of Helling, 811 So. 2d 822, 826 (Fla. 5th DCA

2002).

In deciding summary judgment on Blondell's cross-claim, two recent Florida

_____

(Fla. 4th DCA 2004).  Moreover, Blondell has not cited any Florida cases in
support of her argument, except those cases involving a decedent's devise to a
paramour over a spouse.  See Beatty v. Strickland, 186 So. 542, 544 (Fla. 1939);
Taylor, 581 So. 2d at 1334.  Taylor explained that active procurement is not
required under such circumstances because of the assumption that "a paramour
exercises an 'insidious influence' over the object of his or her affection."  Id. at
1336.  Taylor recognized that cases requiring a showing of active procurement did
not involve the exclusion of a spouse over a paramour, a fact that was "not
insignificant."  Id.  Moreover, it appears that other Florida courts have required
active procurement outside the will context.  See, e.g., Stetzko, 714 So. 2d at 1090
(annuity beneficiary change, real property transfer, and certificates of deposit);
Davis, 642 So. 2d at 1134 (joint survivorship accounts); Fogel v. Swann, 523
So.2d 1227, 1230 (Fla. 3d DCA 1988)(inter vivos transfers).

undue influence cases are worth discussing since one affirms a directed verdict against the parties claiming undue influence and the other reverses the same. See Newman, 887 So. 2d at 386; Hack, 811 So. 2d at 826.

In Newman, the plaintiffs alleged that the defendants unduly influenced their mutual aunt in the execution of a trust. Newman, 887 So. 2d at 385. At trial, the plaintiffs presented evidence that one of the defendants took the aunt to the law office where she executed the trust, and that the other defendant later undertook responsibility for the aunt's personal affairs and obtained a power of attorney to act on her behalf. Id. Both plaintiffs testified that they did not know of any specific acts of undue influence by the defendants. Id. The plaintiffs also presented testimony of a physician specializing in psychiatry who reviewed the aunt's medical record and opined that she was susceptible to undue influence given her possible thyrotoxicosis and possible anxiety and dementia. Id. at 385-86. However, one plaintiff testified that the aunt seemed normal and did not complain about her health. Id. at 385. At the close of evidence, the trial court granted a directed verdict in favor of the defendants, and the appellate court affirmed. Id. at 385, 387.

The appellate court's active procurement analysis was coextensive with its undue influence analysis. It agreed with the trial court that "simply changing a will is not evidence of undue influence. ... No evidence was offered of any improper actions by [one defendant]. [The other defendant's] transporting [the aunt] to the

-42-

lawyer's office and remaining in the waiting room for over an hour does not establish active procurement/undue influence.  Therefore, the directed verdict was properly entered."  Id. at 386.  Relevant here, the appellate court also affirmed the trial court's exclusion of evidence that the aunt had given the defendants substantial gifts, most of which were made three years after the aunt signed the trust.  Id.  The appellate court explained, "Even if admissible, the gifts provide no evidence of active procurement of the trust."  Id.

Newman stands in contrast to Hack.  In Hack, several beneficiaries of an original will alleged that the proponent of a subsequent will, Loraine Janes, unduly influenced the testatrix to change her beneficiaries and leave substantially all of her assets to Janes and Janes' daughter.  Hack, 811 So. 2d at 823, 825.  At trial, the prior beneficiaries presented evidence that the testatrix was in her late 70s and that her health had deteriorated after she signed her original will.  Id. at 824. Specifically, they presented evidence that, in the year that she changed her will, she "had become easily upset, forgetful, agitated, and tired;" that she was admitted to the hospital for hip pain and mental confusion; that several physicians expressed their views "that she probably had Alzheimers, was demented, and lacked sufficient mental capacity to make a will;" that one doctor believed she was "profoundly demented;" and that she was thin, in disarray, made no sense at all, and did not recognize her relatives.  Id.  The prior beneficiaries presented further

evidence that Janes thereafter completely took over the testatrix's care, cut off the

testatrix's contacts with relatives and former friends, took control of the testatrix's

finances, paid the testatrix's bills, placed herself on the testatrix's accounts, and

had her attorney prepare a "family power of attorney" for her (in effect until a judge

appointed another guardian for the testatrix because the judge perceived a

problem with undue influence by Janes). Id. The prior beneficiaries also

presented evidence that a few days after the testatrix's release from the hospital,

Janes or Janes' husband made arrangements for the testatrix to go to an

attorney's office to draft a new will naming Janes as personal representative,

dropping the testatrix's relatives and a close friend as beneficiaries, and naming

the Humane Society, Janes, and Janes' daughter (who the testatrix barely knew)

as beneficiaries. Id. at 824-25. The testatrix had no prior relationship with the

attorney, but Janes had been represented by the attorney in many prior

transactions, including handling the probate of another elderly woman's estate for

which Janes was a personal representative and beneficiary. Id. The prior

beneficiaries presented additional evidence that when the testatrix was

hospitalized again, Janes contacted the attorney and asked him to go to the

hospital to prepare a codicil for the testatrix, informed the attorney of what its

contents should be (including reducing the bequest to the Humane Society to the

benefit of Janes and Janes' daughter), and received the bill therefore. Id. Finally,

the prior beneficiaries presented evidence that Janes or a family member of Janes

again contacted the attorney, brought the testatrix to his office to restate and

reincorporate the subsequent will and its codicil, and Janes thereafter retained the

restated will and codicil in her possession.  Id.

The <u>Hack</u> trial court entered a directed verdict in favor of Janes, but the

appellate court reversed.  Id. at 823.  It held that the prior beneficiaries presented

sufficient evidence of active procurement necessary to raise an inference of undue

influence, finding significant both the testatrix's questionable mental capacity and

Janes' active involvement in the testatrix's subsequent wills and codicil.  Id. at 826.

It further indicated that those facts used to establish the presumption can likewise

be used to establish undue influence.  Id. at 827.

In her attempt to avoid summary judgment, Blondell argues that the

following evidence, viewed in the light most favorable to her and drawing all

reasonable inferences therefrom in her favor, is sufficient to create triable issues of

fact on both active procurement and undue influence: (1) Annie Mae did not write

the printed portion of the Beneficiary Change Request; (2) Annie Mae's Last Will

and Testament was drafted by Willie's attorney, in Willie's presence, and left most

assets to Willie and his children; (3) Willie used his position as a signatory on

Annie Mae's bank account to write checks to himself and Takita just prior to and

just after Annie Mae's death; and (4) Willie was added to one or more of Annie

-45-

Mae's CD accounts.[40]

Since Annie Mae signed the Beneficiary Change Request in 1998 but most

of this evidence relates to events that occurred just prior to Annie Mae's death in

2002 when Annie Mae executed her Last and Testament, the Court asked counsel

---

[40]    Blondell also offers testimony that Annie Mae told Blondell that Willie used
his ownership interest in a portion of the real property to pressure Annie Mae to
eliminate Blondell and add Takita as a beneficiary and that Annie Mae told Blondell
through tears, a few months before Annie Mae's death, that "the family or the
relatives" pressured Annie Mae to keep her money in the family.  (Doc. 108 Ex. 5 ¶
18.)  Takita has raised valid hearsay objections to this testimony.  Blondell asserts
that the testimony, while hearsay, is admissible under the exception entitled "then
existing mental, emotional, or physical condition," which allows admission of "A
statement of the declarant's then existing state of mind, emotion, sensation, or
physical condition (such as intent, plan, motive, design, mental feeling, pain, and
bodily health), but not including a statement of memory or belief to prove the fact
remembered or believed unless it relates to the execution, revocation,
identification, or terms of declarant's will.  Fed. R. Evid. 803(3).  Blondell's
testimony about what Annie Mae told Blondell does not fall within this exception
because it is not an expression of Annie Mae's "then existing state of mind,
sensation, or physical condition."  This exception is more applicable to Blondell's
testimony that Annie Mae told Blondell of her intent or plan to make Blondell a
beneficiary.  See KW Plastics v. U.S. Can Co., 130 F. Supp. 2d 1297, 1299 (M.D.
Ala. 2001)(admitting in tortious interference with business relationship case, under
Rule 803(3), statement by employee that another company's official told her that it
planned to award her employer a particular contract); see also Colasanto v. Life
Ins. Co. of N. Am., 100 F.3d 203, 212 (1st Cir. 1996)("Rule 803(3) removes from
the hearsay prohibition statements that exhibit a declarant's then-existing state of
mind.  But, this exception is not to be construed as a sweeping endorsement of all
state-of-mind evidence. To be admissible under this exception, a declaration,
among other things, must mirror a state of mind, which, in light of all the
circumstances, including proximity in time, is reasonably likely to have been the
same condition existing at the material time.")(quotations omitted).  In any event,
the Court reaches the same conclusion with or without this testimony.  The
statements simply are insufficient to show that Annie Mae's "free agency and
willpower" were destroyed.  See Raimi, 702 So. 2d at 1287.

-46-

for Blondell at the hearing how such "post-hoc" evidence could be relevant to

active procurement of or undue influence over the Beneficiary Change Request.

Blondell's counsel indicated that Willie's actions, viewed together, show a pattern

of undue influence beginning with his name being placed on one of Annie Mae's

CD accounts immediately after the settlement in 1998 and culminating in him or his

children becoming the primary beneficiaries of Annie Mae's assets following her

death in 2002.

     The Court rejects this "pattern" argument and finds that Willie's actions in

2002, some four years after Annie Mae signed the Beneficiary Change Request,

have very little or no relevance to the issue of whether Willie actively procured or

unduly influenced Annie Mae's Beneficiary Change Request.  Florida's cause of

action for undue influence is based on actions occurring at the time of the

challenged bequest and not thereafter.  See, e.g., Newman, 887 So. 2d at 386.

This then leaves evidence that Willie possibly was added to one of Annie Mae's

CD accounts immediately after the settlement in 1998, that Annie Mae did not fill-

out the printed portion of the Beneficiary Change Request, and that Annie Mae

was capable, but perhaps sad or even depressed, when she signed the

Beneficiary Change Request.  This paucity of evidence makes this case more akin

to Newman and far from Hack; it does not create a triable issue of fact as to

whether Willie actively procured or unduly influenced Annie Mae to sign the

Beneficiary Change Request.

In coming to this conclusion, the Court has reviewed and is influenced by Newman, Hack, and the many other Florida cases on the subject of undue influence.  See, e.g., In re Estate of Flohl, 764 So. 2d 802, 804 (Fla. 2d DCA 2000)(reversing trial court and finding insufficient evidence of active procurement or undue influence where only evidence offered therefor was testimony of witnesses who did not approve of beneficiary, who believed beneficiary turned testator against them, and who felt testator should not have left son out of will; and stressing that "[u]nless the evidence shows that the testator has been precluded from freely exercising his will to dispose of his money and his possessions as he chooses, his wishes must be respected"); Stetzko, 714 So. 2d at 1091 (finding insufficient evidence of active procurement where decedent was not an invalid at time beneficiary change made); Raimi, 702 So. 2d at 1288 (reversing trial court's finding of undue influence and concluding that beneficiary's presence when testator expressed her desire to make a new will insufficient to establish active procurement, that testator's motivation for disinheriting family was anger and animosity over incident, and that there was insufficient evidence to support trial court's finding that decedent was "duped"); Estate of Brock, 692 So. 2d at 912 (finding presumption established by evidence that beneficiary was present and participated in discussions with testator and attorney, had knowledge of will

-48-

contents prior to its execution, gave instructions to attorney, and kept the will and trust documents in his possession); Davis, 642 So. 2d at 1131, 1134 (reversing trial court and finding insufficient evidence of active procurement of joint survivorship accounts where beneficiary merely drove decedent to and from banker and suggested possible institutions and decedent was competent though sad and depressed over wife's death); Strum v. Gibson, 185 So. 2d 732, 733 (Fla. 2d DCA 1966)(finding insufficient evidence of active procurement where beneficiary drove testatrix to attorney's office to execute will and perhaps recommended attorney but was not present when will executed and did not know its contents); Jacobs v. Vaillancourt, 634 So. 2d 667, 667, 671 (Fla. 2d DCA 1994)(finding no undue influence where no evidence that beneficiary actively procured challenged instruments or even knew they were being prepared until after their execution).

Likewise, Blondell cannot, as a matter of law, prove that Willie acted as Takita's agent in this matter.  As Blondell points out, Florida recognizes agency by ratification.  In re Monetary Group, 95 B.R. 803, 810 (Bankr. M.D. Fla. 1989); Computel, Inc. v. Emery Air Freight Corp., 919 F.2d 678, 683 (11th Cir. 1990)(citing Florida cases).  But ratification requires: "(1) acceptance by the principal of the benefits of the agent's acts[;] (2) with full knowledge of the facts[;] and (3) circumstances or affirmative election indicating an intention to adopt the

-49-

unauthorized arrangement." <u>In re Monetary Group</u>, 95 B.R. at 810.  This requirement goes beyond a mere showing of a family relationship, even one as close as that of a father and adult child.

At the very least, Blondell cannot establish the second element because she has not offered any evidence that Takita had full knowledge of any actions by Willie relating to the Beneficiary Change Request.  Indeed, Takita testified without contradiction that she moved from Lake City when she got married in 1998 and did not even know about the Beneficiary Change Request until after Annie Mae's death.  Blondell's evidence that Takita accepted checks written on Annie Mae's account and signed by Willie in late 2001 and in 2002 as well as Takita's presence at Annie Mae's execution of her Last Will and Testament in 2002 are too far removed from the Beneficiary Change Request to have any probative value on this issue.

## III.   **Conclusion**

For the foregoing reasons, it is hereby **ORDERED**:

A.     Plaintiffs/Counterclaim Defendants' Motion for Interpleader and Motion for Summary Judgment on Remaining Counterclaims (Doc. 96-1) is **GRANTED IN PART AND DENIED IN PART** as follows:

1.     The motion for interpleader (Doc. 96-1) is **GRANTED** in favor of Metropolitan Life Insurance Company and Metropolitan Insurance and Annuity

Company and against Tiaresa Carter, Blondell Johnson, Takita Williams, and Willie Williams to the extent it requests a declaration of rights to the monthly annuity payments.  The motion for interpleader (Doc. 96-1) is **DENIED** to the extent it requests other remedies.

2.      Final judgment will direct the Clerk to pay Takita Williams, via her attorney's trust account,[41] all amounts that have been deposited by Metropolitan Life Insurance Company and Metropolitan Insurance and Annuity Company into the Court registry (Doc. 117) pursuant to Order dated October 14, 2005 (Doc. 113).

3.      Metropolitan Life Insurance Company and Metropolitan Insurance and Annuity Company shall timely make any remaining unpaid past due and all future monthly annuity payments to Tiaresa Carter and Takita Williams in equal shares until the payment obligation ends on July 15, 2013.

4.      Metropolitan Life Insurance Company's and Metropolitan Insurance and Annuity Company's request for attorneys' fees and costs, found within Plaintiffs/Counterclaim Defendants' Motion for Interpleader and Motion for Summary Judgment on Remaining Counterclaims (Doc. 96-1), is **DENIED.**

---

[41]     Takita Williams' attorney should file payment instructions to be used by the Clerk in making this payment.

-51-

5.     Summary judgment is **GRANTED** in favor of Metropolitan Life Insurance Company and Metropolitan Insurance and Annuity Company on Blondell Johnson's counterclaim (Docs. 13, 55).

6.     Willie Williams' Intervenor Complaint Against Metropolitan Insurance and Annuity Company (Doc. 76) is **DISMISSED AS MOOT.**

B.     Takita Williams' Motion for Final Summary Judgment on Complaint for Interpleader and on Her Counterclaim for Breach of Contract (Doc. 91) is **GRANTED IN PART AND DENIED IN PART**.  Summary judgment is **GRANTED** in favor of Takita Williams and against Metropolitan Life Insurance Company on that portion of her counterclaim (Docs. 12, 51) alleging breach of contract for failure to make monthly annuity payments that became due to her between September 2002 and October 2003 in the total amount of $18,460.[42]  The adjudication that Takita Williams will receive the deposited funds as provided in III(A)(2), <u>supra</u>, resolves the remaining portion of her counterclaim.

C.     Takita Williams' Motion for Final Summary Judgment on Blondell Johnson's Cross-Claim for Undue Influence (Doc. 93) is **GRANTED.**

D.     The Amended Consent Motion of Tiaresa E. Carter to be Dismissed as a Party From the Suit (Doc. 114-1) is **DENIED AS MOOT.**

---

[42]     This necessarily means that Metropolitan Life Insurance Company's motion for summary judgment on this portion of Takita Williams' counterclaim (Doc. 96-1) is **DENIED.**

E.      The Court will withhold entry of final judgment until resolution of Takita

Williams' outstanding claims for prejudgment interest, attorneys' fees, and costs.

The Court encourages the parties to work these issues out and to submit a joint

stipulated final judgment dispositive of all issues.  If they cannot, a further motion

concerning any of these issues must be filed no later than **November 30, 2005**.

The Court will enter a final judgment after resolving any outstanding issues.

**DONE AND ORDERED** at Jacksonville, Florida on October 27, 2005.

**TIMOTHY J. CORRIGAN**
United States District Judge

p.
Copies to counsel of record

-53-